## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01961-SBP

MELISSA BONGIOVANNI,

    Plaintiff,

v.

THE CITY AND COUNTY OF DENVER,

    Defendant.

---

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**Susan Prose, United States Magistrate Judge**

    This matter is before the court on Defendant's Motion for Summary Judgment. ECF No. 35 ("Motion" or "Motion for Summary Judgment"). Plaintiff Melissa Bongiovanni brings claims against defendant the City and County of Denver (the "City") asserting discrimination on the basis of disability in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"). *See generally* Amended Employment Discrimination Complaint, ECF No. 6 at 5-6. The City moves for summary judgment on all of Plaintiff's claims. Plaintiff filed a response, ECF No. 38, and the City filed a reply. ECF No. 39. The undersigned Magistrate Judge fully presides over this case pursuant to 28 U.S.C. § 636(c)(1), the parties' consent, ECF No. 21, and the Order of Reference dated April 28, 2025, ECF No. 46.

    For the reasons set forth below, the court respectfully **GRANTS** the City's Motion for Summary Judgment and therefore **DENIES as moot** the City's Motion to Exclude the Testimony of Plaintiff's Non-Retained Experts Pursuant to Fed. R. Civ. P. 26(a)(2) and Fed. R.

Evid. 702. ECF No. 34.

## SUMMARY FOR PRO SE PLAINTIFF

The court has determined that the City's Motion for Summary Judgment must be granted. After a careful review of the record—including all of the documents you submitted—the court finds that the City has met its ultimate burden to persuade the court that no genuine issue of material fact exists and that a trial is not required in this matter. This decision does not diminish the service you have performed, and continue to perform, for the City. It simply means that, when the undisputed material facts in the record before the court are evaluated pursuant to the applicable legal standards, the City is entitled to judgment as a matter of law.

Please review the entire order, in which the court explains its reasons for the conclusions it has reached as to each of your claims.

## UNDISPUTED MATERIAL FACTS

As a preliminary matter, Plaintiff did not make a specific response to the City's Statement of Undisputed Material Facts ("City's SOF"). *See* Motion at 3-13. The court therefore is allowed to accept as true all material facts asserted and properly supported in the Motion. Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court *may* . . . consider the fact undisputed for purposes of the motion[.]") (emphasis added); *Beard v. Banks*, 548 U.S. 521, 527 (2006) ("[B]y failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [the plaintiff] is deemed to have admitted the validity of the facts[.]").

The court refrains from taking such an aggressive approach. Rather, in deference to

Plaintiff's pro se status, and to ensure a complete record, the court has evaluated the substance of Plaintiff's response to the Motion for Summary Judgment—and has carefully reviewed the contents of all documents appended to the briefing on the Motion—to determine whether she has successfully raised any genuine dispute of material fact requiring a trial. However, most of Plaintiff's statements merely state legal conclusions or reiterate information contained in the City's Statement of Undisputed Material Facts and thus create no dispute. To the extent Plaintiff has come forward with factual assertions that purport to refute a material aspect of the City's factual narrative, the court finds that none suffice to show a genuine issue for trial.

The court draws from the record the following material facts, presented in chronological order, which the court construes in Plaintiff's favor and which are undisputed unless otherwise noted:

*Essential Functions of Plaintiff's Position.* Plaintiff began her employment with the City and County of Denver, Denver County Court, Probation Division, as a Staff Probation Officer on January 13, 2014. City's SOF ¶ 1. On October 18, 2018, Plaintiff was promoted to Senior Probation Officer (Probation Officer III), a position she continues to hold to this day. *Id.* ¶¶ 2, 61.

The position of Probation Officer III requires the following essential functions:

- Meet with and interview clients in a variety of settings, including the court, the jail, in their homes, and in the community;
- Conduct field supervision to evaluate client's compliance with terms and conditions of probation and court orders;
- Do home visits (which requires training in Defensive Skills Tactics);
- Testify in court and make court appearances;
- Escort client to the Second Chance Program and other facilities;
- May participate in interviewing process for lower-level Probation Officers;

- May train and mentor newly hired Probation Officers; and
- May represent the department on community-based review boards and in public meetings and public education projects.

*Id.* ¶ 3. These essential functions "require physical presence in the field outside of the office work location, such as: court, client homes, third-party service facilities, and/or public community spaces." *Id.* ¶ 4. And the essential functions of the Probation Officer III position also "require special training, such as: escorting clients to third-party facilities and performing home visits." *Id.* ¶ 5. The field supervision component of the essential functions specifically requires the successful completion of the "Defensive Skills Tactics course as per policy and [t]o be able to engage in defensive skills maneuvers." *Id.* Field supervision responsibility mandates that the Probation Officer wear a bullet proof vest. *Id.* ¶ 7.

*Plaintiff's First Request for Accommodation.* On some unknown date prior to 2022, Plaintiff brought to the City's attention the existence of various medical conditions for which she sought, and was approved to use, leave under the Family and Medical Leave Act ("FMLA"). *Id.* ¶ 9. On or about January 24, 2022, after receiving a request to attend an in-person training, Plaintiff told her supervisors that she was "still recovering from Covid," and had "issues with her lungs." *Id.* Plaintiff advised that she was not "comfortable training with large groups" or "attending large trainings." *Id.*

The next day—January 25, 2022—the City initiated the interactive process under the ADA and also immediately accommodated Plaintiff by excusing her from the in-person training scheduled for January 26 and 27, 2022, "pending receipt of requested medical documentation supporting her accommodation request, which was due February 8, 2022." *Id.* ¶ 11. Plaintiff requested an extension of the February 8 deadline to February 15, 2022, which the City

approved. *Id.* ¶ 12. However, Plaintiff did not provide supporting information from her health care provider and so the City closed the interactive process on February 16, 2022. *Id.* ¶ 13.

   ***April 2022 Investigation of a Statement by Plaintiff's Co-Worker.*** Sometime in April 2022, Laurie Moore, who held the title of "Senior Human Resources Business Partner" for the Denver County Court, received information of a report made by Plaintiff concerning a comment about her medical situation made by a Probation employee named Francisco Hinojosa. *Id.* ¶ 14. Ms. Moore initiated an investigation. *Id.* ¶¶ 14-15.

   Specifically, according to the summary of Ms. Moore's findings, Plaintiff relayed that Mr. Hinojosa "had stated that the DCC [Denver County Court] Probation Management Team had considered [Plaintiff] to coach or train a new hire but did not do so due to her current medical situation." ECF No. 35-5 at 2; *id.* at 3 (noting that Hinojosa was alleged to have "made a comment to [Plaintiff] that she was not selected to train new officers due to her FMLA status and availability"). Ms. Moore interviewed Plaintiff, who reported that she had a meeting with Mr. Hinojosa "regarding a warrants issue," at which time Mr. Hinojosa

> brought up training, he is the new head training officer or supervisor and he said to me that he had considered me or thought about me for training the new hires that we have coming in however, kind of in the same breath, but with your medical stuff or issues – not that I know really what's going on – was kind of how he said it to me, I didn't know if you would be around, so like we didn't. At that time, I felt very [deer] in headlights and didn't know how to respond to that.

*Id.* at 5. Ms. Moore then interviewed Mr. Hinojosa, who told her that he had spoken with Plaintiff, but recalled that he had "said something like the following" to her: "[Y]ou know we have thought of you as a trainer but I know you have FMLA going on and I don't know if you'll be available, or something like that, I don't know when you will be able to support us training

these [Probation Officers], you tell me, whenever you are ready, I'd like you to help us, I'd like you to be part of the team training new officers." *Id.*

Ms. Moore closed the investigation on May 13, 2022, after she was unable to corroborate Plaintiff's allegation that Mr. Hinojosa had made a comment to Plaintiff "that she was not selected to train new officers due to her FMLA status and availability." City's SOF ¶ 17; ECF No. 35-5 at 5. Mr. Hinojosa, who was not Plaintiff's supervisor, received no discipline as a result of Plaintiff's allegation, but was counseled and assigned to complete FMLA and ADA sensitivity training for supervisory employees. City's SOF ¶¶ 18, 20; ECF No. 35-5 at 5; *cf.* ECF No. 35-20 at 174:18-23 (Plaintiff's deposition testimony identifying Demond Harper as her supervisor).[1] Plaintiff later confirmed that Mr. Hinojosa was not responsible for assigning training responsibilities and that "[t]he training that he was talking about would be mentoring . . . mentorship" of new hires. City's SOF ¶ 21; ECF No. 35-20 at 155:20-156:2.

**May 2022 Reasonable Accommodation Questionnaire.** On May 17, 2022, the City received a document known as a Reasonable Accommodation Questionnaire ("RAQ") from Plaintiff's health care provider, Lane Fairbairn, DO. *Id.* ¶ 22. In the May 2022 RAQ, Dr. Fairbairn described Plaintiff as having multiple medical diagnoses[2] and stated that she was

---

[1] The City represents that Mr. Hinojosa has not engaged in similar behavior since he made the comment to Plaintiff in March 2022. City's SOF ¶ 19.

[2] Because Plaintiff's medical documentation and exhibits referencing her medical diagnoses are subject to a Level 1 restriction on access, this court takes a consistent approach and refrains from specifically describing the nature of those diagnoses here. *But see, e.g.*, *Blanco v. HCA-Healthone, LLC*, No. 19-cv-00928-PAB-SKC, 2021 WL 351252, at *1 (D. Colo. Feb. 2, 2021) ("Thus, Plaintiffs have waived any physician-patient privilege or privacy rights related to the autopsy or the cause of death by placing those matters squarely at issue in this litigation."). However, the court does not deem itself constrained from referencing other information

unable to perform all of the essential functions of her position because of three key work restrictions: (1) inability to wear a bullet proof vest; (2) inability to perform defensive skills and maneuvers; and (3) a requirement to be near a restroom at all times. *Id.* ¶¶ 23-24. As of the date of the May 2022 RAQ, Dr. Fairbairn was unable to determine whether Plaintiff's work restrictions were temporary or permanent. *Id.* ¶ 27.

Based on Dr. Fairbairn's assessment, on May 19, 2022, the City approved Plaintiff's workplace accommodation requests for a period of six months to allow for a reevaluation to determine whether those work restrictions were of a temporary or permanent nature. *Id.* ¶ 27.

***August 2022 RAQ.*** On August 4, 2022, Plaintiff presented an updated Reasonable Accommodation Questionnaire from a second health care provider: Stephen Shepherd, D.O. *Id.* ¶ 28. In the August 2022 RAQ, Dr. Shepherd described Plaintiff as being able to perform the essential functions of her position, provided the following restrictions were implemented:

- Intermittent time off from work[3]
- Access to a restroom at all times
- No defensive training/tactics
- No bulletproof vest
- No fieldwork
- Periodic rest breaks
- "Comfort focused" clothing/shoes
- Handicap parking
- Flexibility to work from home during "flares" of Plaintiff's condition

*Id.* ¶ 30. These restrictions, according to Dr. Shepherd, were "permanent" as of August 4, 2022.

---

contained in the restricted documents as necessary to explain its reasoning here. The parties, as well as the public, are entitled to know the reasons for the court's decision.

[3] Dr. Fairbairn offered no explanation concerning the frequency or duration of this restriction. ECF No. 36-2 at 2.

*Id.* ¶ 33. Notwithstanding Dr. Shepherd's statement in the August 2022 RAQ that Plaintiff was

able to perform all of the essential functions of the Probation Officer III position, the restrictions

he found to be permanent disqualified Plaintiff from performing all fieldwork, including home

visits requiring that she wear a bullet proof vest and that she be trained in the use of defensive

tactics. *Id.* ¶¶ 31, 35.

The assessment in the August 2022 RAQ prompted the City's Office of Human

Resources Leave Team ("OHR Leave Team"), a group that determines eligibility under the ADA

and leads the interactive process under that statute, *see* ECF No. 35 at 2, to find that Plaintiff did

not qualify for accommodation for the position of Probation Officer III because she could not

perform the essential functions of her position—with or without a permanent reasonable

accommodation. *Id.* at p. 2 & ¶ 36. On August 17, 2022, the OHR Leave Team informed

Plaintiff by telephone of its determination that she was not qualified for an accommodation as a

Probation Officer III. *Id.* ¶ 38. On August 18, 2022, Plaintiff received a document the City calls

an "interactive process conclusion letter." *Id.* ¶ 39.

That letter set forth a detailed history of the interactive process and the grounds for

determining that Plaintiff was not considered a qualified individual for the Probation Officer III

position because of the permanent physical limitations preventing her from performing essential

functions of the job. *Id.* Specifically, Plaintiff was informed that the City could not accommodate

her requested accommodations because "the symptoms of [her] medical condition make [her]

unable to perform the essential functions of [her] Position as a Probation Officer III," including

in the following ways:

- Your position requires wearing a bullet proof vest for your safety and protection. The inability to wear a bullet proof vest creates a safety risk for you, the agency and the City.

- The inability to complete Defensive Skills Tactics Training prevents you from obtaining the certification needed to do home visits where you meet with clients and/or assess their living conditions, which is an essential function of your job. This also creates a safety risk for you, the agency and the City. At a moment's notice you may need to engage in defensive tactics with a client and, without that training, you are not equipped to work in the field.

- The inability to do fieldwork and the need for immediate access to restrooms prevents you from performing many of the essential functions of your job including meeting with clients in a variety of settings including the court, the jail, in their homes and out in the community, and would prevent you from performing escort services of clients to the Second Chance Program (or other facilities) or from making court appearances. The agency is not able to ensure your access to restrooms while performing field and courtroom duties. This limits the ability to assign caseloads in specialized units with various cases that require the above.

ECF No. 35-8 at 3. After receiving the letter, Plaintiff and Joyce Lucero, the "HR ADA Administrator," met via videoconference on August 18, 2022, to discuss the process for reassignment to a new position as a possible accommodation. City's SOF ¶ 40.

*August-September 2022 Investigation.* In an August 22, 2022 email to Ms. Lucero, Plaintiff disagreed that the articulated essential functions of her position were in fact essential functions, *see* ECF No. 35-10 at 3-5, and expressed her belief that she was being retaliated against because she had "filed a grievance against management"—an apparent reference to her earlier complaint against Mr. Hinojosa. *Id.* at 5. The City then initiated an investigation into Plaintiff's allegations of "harassment, discrimination and retaliation" in connection with the interactive process. City's SOF ¶ 42; ECF No. 35-11 at 1. That investigation culminated in the production of a 21-page report issued on September 30, 2022. City's SOF ¶ 44; ECF No. 35-11.

Ultimately, the individuals conducting the investigation—HR Director Dawn Palutke and Human Resources Business Partner Miranda Johnson (collectively, the "HR Investigators")—found that Plaintiff's "allegations of discrimination, harassment and retaliation cannot be substantiated." ECF No. 35-11 at 20. The HR Investigators made some recommendations "for improvement within the Probation Department." *Id.* Those recommendations included the suggestion that, because another employee had received a "permanent exemption from home visits and Defensive Skills Tactics training," Plaintiff "should be afforded the same exemption." *Id.* at 10; City's SOF ¶ 46.

The HR Investigators also addressed Plaintiff's complaints about several statements made by co-workers which she construed as harassment.[4] According to Plaintiff, Ms. Lucero had stated during the videoconference meeting on August 18, 2022, "that the management team refused to set parameters to work with disability and requested accommodations [and] stated that in doing so [Plaintiff] would be a 'burden' to other officers within" Denver County Court Probation. ECF No. 35-11 at 1, 5. The investigators concluded that "[t]he use of the term undue burden is commonly used interchangeably with undue hardship when describing provisions of the ADA," and that there was no "information to indicate Ms. Lucero intended to disparage Ms. Bongiovanni by use of the term 'burden.'" *Id.* at 19.

Plaintiff complained that a second co-worker, Chief Probation Office Deanna Maes, made a comment about Plaintiff's shoes, indicating that they did not comply with policy. *Id.* at 4,

---

[4] The investigators noted that Plaintiff's "previous complaint [against Mr. Hinojosa] was formally investigated and appropriate recommendations were made to resolve the issue." ECF No. 35-11 at 7.

15; *see also id.* at 16 (Maes's description of her statement as informing Plaintiff that she should "work with her doctor to get a doctor's note to support wearing" tennis shoes). Ms. Maes also is said to have made two remarks about Plaintiff's ergonomic desk: "I don't see you standing yet," and "you're not standing." *Id.* at 18. The HR Investigators deemed these comments "insensitive and inappropriate" in light of their association with Plaintiff's medical needs, and recommended that Ms. Maes "be reminded of the need to always maintain professional boundaries with staff of the Department and refrain from commenting on medically related issues outside of her official capacity as Chief Probation Officer." *Id.* at 21.

On October 5, 2022, Plaintiff was advised that the investigation was closed and that "all appropriate actions had been or will be taken to address potentially inappropriate workplace behavior." City's SOF ¶ 51.

***October 2022 RAQ.*** The OHR Leave Team continued to work with Plaintiff on the job reassignment process until October 24, 2022, when it received another RAQ from Dr. Shepherd. City's SOF ¶ 53. In an update regarding Plaintiff's work restrictions, Dr. Shepherd represented that Plaintiff was able to perform fieldwork. *Id.* ¶ 53; ECF No. 36-4 at 2 (noting that Plaintiff "may be off site for up to 8 hrs/day" and had more flexibility with respect to access to a bathroom). While Dr. Shepherd noted that Plaintiff should continue to be exempt from the requirement that she wear a bullet proof vest because it exacerbates her physical symptoms, he further stated that this work restriction was "temporary" and that Plaintiff was "working with specialists to adjust medication" and "pursuing additional therapies." ECF No. 36-4 at 2. Dr. Shepherd anticipated an end date for that work restriction, and any others, of October 20, 2023.

*Id.*[5]

**November 2022 Conclusion of the Interactive Process.** On November 3, 2022, the City,

through Ms. Lucero, sent Plaintiff an interactive process conclusion letter. City's SOF ¶ 55; ECF

No. 35-14. The letter detailed the history of the interactive process between the City and Plaintiff

and the City's determination that it was able to accommodate Plaintiff's updated work

restrictions in her workplace, as outlined in the October 2022 RAQ. City's SOF ¶ 55. The City

closed Plaintiff's ADA case and the job-reassignment process, effective November 3, and asked

her to return to her position as a Probation Officer III on November 4, 2022. *Id.* ¶ 56.

Plaintiff continues to hold the position of Probation Officer III and "is able to

successfully perform her essential job functions with the accommodation she was provided by

the [Denver County Court] and the City and County of Denver." *Id.* ¶ 61; ECF No. 35-19 ¶ 10.[6]

**LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if

---

[5] It is unclear which, if any, restrictions are currently in place, but that fact is not material to the court's disposition of the Motion for Summary Judgment.

[6] It is also undisputed that Plaintiff filed a complaint of discrimination with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission on October 9, 2022; that the Division found "insufficient evidence to support [Plaintiff's] claims of discrimination" and issued a "No Probable Cause determination"; and that the Colorado Civil Rights Commission affirmed the decision of no probable cause on June 26, 2023. City's SOF ¶¶ 58-60. However, the CCRD's "findings and determinations are not binding on this court, especially with respect to the admission of factual allegations." *Ayileka v. Highline Academy Inc.*, No. 17-cv-00853-KMT, 2018 WL 11471736, at *3 (D. Colo. Oct. 4, 2018) (citation omitted).

there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (cleaned up).

A movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim, but need only point the court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the movant has met this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). When considering the evidence in the record, the court is prohibited from weighing the evidence or determining the credibility of witnesses. *Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002) (quotation omitted).

In applying the above principles, this court is mindful that Plaintiff proceeds pro se and thus affords her papers and filings a liberal construction. *Smith v. Allbaugh*, 921 F.3d 1261, 1268 (10th Cir. 2019). But the court cannot and does not act as her advocate, *United States v. Griffith*, 928 F.3d 855, 864 n.1 (10th Cir. 2019), and applies the same procedural rules and substantive law to Plaintiff as to a represented party. *See Requena v. Roberts*, 893 F.3d 1195, 1205 (10th Cir. 2018); *see also Dodson v. Bd. of Cnty. Comm'rs*, 878 F. Supp. 2d 1227, 1236 (D. Colo. 2012) ("*Pro se* status does not relieve Plaintiff of the duty to comply with various rules and procedures governing litigants and counsel, or the requirements of the substantive law[.]").

13

**ANALYSIS**

Plaintiff's "Statement of Claims" lists "failure to accommodate, disability discrimination/harassment, [and] failure to engage in the interactive process in violation of the American with Disabilities Act." ECF No. 6 at 5. As explained in this order, the court construes Plaintiff's pleading as attempting to raise claims under the ADA for failure to accommodate her disability and for unlawful discrimination on the basis of her disability; for disability discrimination based on a harassing, hostile work environment; and for disability-based retaliation. The City moves for summary judgment on each of Plaintiff's claims. Motion at 13-24. The court analyzes whether summary judgment is appropriate as to each claim, in turn.

**I.    Failure-to-Accommodate Claim**

An employee asserting a failure-to-accommodate claim must show that "1) she was disabled; 2) she was otherwise qualified for the position; 3) she requested a plausibly reasonable accommodation; and 4) [the employer] refused to accommodate her disability." *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020) (citing *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018)); *see also Dansie v. Union Pacific R.R. Co.*, 42 F.4th 1184, 1192 (10th Cir. 2022) (same). "Failure-to-accommodate claims do not require a showing that the employer's actions were motivated by discriminatory animus, because the failure to provide a reasonable accommodation to a qualified employee with a disability is inherently 'on the basis of the disability,' regardless of the employer's motivation.'" *Hurt v. Sch. Dist. No. 1 in Cnty. of Denver Colo.*, 664 F. Supp. 3d 1227, 1235 (D. Colo. 2023), *appeal dismissed sub nom. Hurt v. Sch. Dist. No. 1 in Cnty. of Denver*, No. 23-1136, 2023 WL 7215340 (10th Cir. June 1, 2023) (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017), and 42 U.S.C. § 12112(a) (cleaned up)).

Neither is an adverse employment action a required element of a failure-to-accommodate claim. *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 791 (10th Cir. 2020) (en banc). A reasonable accommodation can include accommodating an individual in her position or "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). If a plaintiff establishes a prima facie failure-to-accommodate claim, the burden shifts to the defendant "to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Aubrey*, 975 F.3d at 1005 (quoting *Lincoln*, 900 F.3d at 1204); *see also* 42 U.S.C. § 12112(b)(5)(A).

Reduced to its essence, the temporal scope of the failure-to-accommodate claim at issue here is quite narrow. The parties do not dispute that the City temporarily approved the accommodations Plaintiff requested in the May 2022 RAQ and, later, indefinitely approved all accommodations Plaintiff sought in the October 2022 RAQ. Therefore, any alleged failure to accommodate occurred, if at all, in connection with the August 2022 RAQ. There, Plaintiff sought exemptions from performing all fieldwork, from wearing a bullet proof vest, from executing defensive skills and maneuvers, and from maintaining an established work schedule at her onsite location. City's SOF ¶ 30. She also requested an accommodation in the form of close proximity to a restroom at all times. *Id.*

The City argues that Plaintiff cannot establish a prima face case of failure to accommodate under the ADA because she can present no evidence showing that she requested a plausibly reasonable accommodation. Motion at 13-17. Therefore, the court focuses its analysis on that element of the prima facie case. *See Punt*, 862 F.3d at 1050 ("We start and end our

analysis with the third element of Plaintiff's prima facie case—whether she requested a plausibly reasonable accommodation.") (quotation omitted).

### A.    Request for an Exemption from an Essential Function

The City contends that Plaintiff did not request a plausibly reasonable accommodation because she sought to a permanent exemption from all fieldwork, an essential function of the position of Probation Officer III.[7]

Essential functions are "fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). "Marginal functions" of the position are not included in the term "essential function." *Id.* "In determining whether a function is essential," courts are directed to rely "in part, on what the employer tells us those fundamental duties are." *Hampton v. Utah Dep't of Corr.*, 87 F.4th 1183, 1192 (10th Cir. 2023) (citing 29 C.F.R. § 1630.2(n)(3)(i)). Put another way, "courts must give consideration to the employer's judgment as to what functions of a job are essential." *Unrein v. PHC-Fort Morgan, Inc.*, 993 F.3d 873, 877 (10th Cir. 2021) (quoting *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003)). While not entitled to "unbounded deference," *Hampton*, 87 F.4th at 1193, the court "weigh[s] heavily the employer's judgment regarding whether a job function is essential." *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009). "It is not up to employees 'to define the essential functions of their positions based solely on their personal

---

[7] The City also argues, though with somewhat less emphasis, that Plaintiff's requested accommodations of maintaining an established work schedule and having access to a restroom at all times would have eliminated essential functions of her role. Motion at 14. However, the court understands the requested elimination of fieldwork to be the City's core argument and so focuses on that essential function here. The court's finding that this request was unreasonable as a matter of law disposes of Plaintiff's failure-to-accommodate claim.

viewpoint and experience.'" *Brown v. Esper*, No. 17-cv-02004-RM-STV, 2019 WL 6893019, at *4 (D. Colo. Dec. 18, 2019), *aff'd sub nom. Brown v. Austin*, 13 F.4th 1079 (10th Cir. 2021) (quoting *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004)). "Rather, it is up to employers to describe the functions required to perform a position, and the Court does not second-guess their judgment if their descriptions are 'job-related, uniformly enforced, and consistent with business necessity.'" *Id.* (quoting *Mason*, 357 F.3d at 1119); *see also Hampton*, 87 F.4th at 1193 (recognizing that courts "will usually defer to the employer's judgment absent evidence suggesting the purportedly essential function has a tangential relationship with the actual job, is inconsistently enforced, or otherwise lacks a nexus with business needs").

"The determination of whether a requested accommodation is reasonable 'must be made on the facts of each case taking into consideration the particular individual's disability and employment position.'" *Punt*, 862 F.3d at 1050 (quoting *Mason*, 357 F.3d at 1123-24). "Evidence of whether a particular function is essential includes, but is not limited to," information concerning the employer's judgment, written job descriptions, the time spent performing the function, the consequences if the individual cannot perform the function, the work experience of those in the position in the past, and the current work experience of those in similar positions. 29 C.F.R. § 1630.2(n)(3). Importantly, "an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Unrein*, 993 F.3d at 878 (quoting *Punt*, 862 F.3d at 1051).

In support of its position that conducting fieldwork is an essential function of the Probation Officer III position, the City relies on the job description for the position, which commences with the statement that the employee "[p]erforms full-performance level professional

work by providing case management in the most difficult and complex cases through interviewing, investigating, intake/assessment, case planning, counseling and referring clients for probation and preparing pre-sentencing reports and other documents for the court." ECF No. 35-1 at 1. In this context, the description proceeds to explain that the "Essential Duties" of the position require that the officer

> [c]onduct field supervision to evaluate compliance with terms and conditions of probation, as well as any special orders from the court. Build rapport with the probationer, community, and his/her support system. Assess peer and family associations. Verify the probationer's address and determine if the probationer needs assistance with food, shelter, clothing, childcare, etc. Opportunity to provide direct assistance and to provide official documentation or service of court documents.

ECF No. 35-1 at 2. Further:

> Individuals assigned field supervision responsibilities will be required to successfully complete the Defensive Tactics course as per policy and be able to engage in defensive skills maneuvers.

*Id*.; *see also* City's SOF ¶¶ 3, 5, 7. Ms. Lucero, the City's HR ADA Administrator, reaffirmed these points, describing the essential functions of the position as requiring Plaintiff's "physical presence" and her "need to be prepared to perform on any given day"—tasks that included meeting and interviewing clients at "the court, the jail, in their homes and out in the community"; conducting "field supervision to evaluate clients' compliance with terms and conditions of probation and court orders"; performing "home visits (which requires certification in Defensive Skills Tactics)"; testifying in court and making court appearances; and escorting "clients to the Second Chance Program and other facilities." ECF No. 35-8 at 11.

The City also points to Plaintiff's own testimony about the requirements of her job:

> Q      And then "Conduct field supervision to evaluate compliance with terms and
> conditions of probation."
> A      Sure.
> Q      Tell me a little more about that one. That one seems a little more relevant
> to what we're talking about here.
> A      So this one is talking about the home visits, going out to a person's home -
> and engaging them there. So that is just meeting their - or seeing where they are
> and seeing what kinds of resources they need. Folks can come into the office and
> tell you everything's okay, but then when you get to their house, you know, you're,
> like, "Oh, my gosh." And there's a lot of things that we can help with here. We can
> help get them better housing resources. Maybe they need some groceries and we
> have a gift card. So that would be what I think this means, the fieldwork and going
> out there.

ECF No. 35-20 at 24:14-25:10 (cleaned up). Additionally, per Plaintiff's testimony:

> A      There is an in-office policy. They would like our folks that were assessed at
> a high level of risk to be met on a certain basis. I think it's maybe once every 60
> days in the field, but then they're also coming into the office every 30 days.

*Id.* at 25:19-24.

Viewing this undisputed evidence in the light most favorable to Plaintiff, the court finds

there is no genuine dispute that fieldwork is an essential function of the Probation Officer III

position. Neither is there a genuine dispute that Dr. Shepherd affirmatively stated in the August

2022 RAQ that Plaintiff was restricted from performing *all* fieldwork. ECF No. 36-4 at 2

(statement that Plaintiff's "Physical restrictions" included: "No defensive training/tactics. No

bulletproof vest. *No fieldwork*.") (emphasis added). Plaintiff's confirmed inability to perform

fieldwork prevented her from performing an essential function of the job, namely, that she

engage with probationers outside a controlled setting, in direct physical contact with them in the

field: including meeting with them; supervising them to evaluate their compliance with the terms

and conditions of their probation and court orders; visiting them in their homes; and escorting

19

them to third-party service facilities. City's SOF ¶¶ 3-7. This record also prohibits any conclusion that fieldwork was a "marginal" aspect of the duties of persons who hold the position of Probation Officer III—employees who must provide "case management in the most difficult and complex cases." *See* ECF No. 35-1 at 1; 29 C.F.R. § 1630.2(n)(1) ("essential functions" do not include "marginal functions"); *see also Mason*, 862 F.3d at 1121 ("Avaya presented significant evidence demonstrating teamwork is an essential function of the service coordinator position because the coordinators typically assist and cover for one another in a job even Mason described as 'very hectic.'"). As Plaintiff acknowledges, performing such work requires a firsthand view of the living situation of a client in the field. ECF No. 35-20 at 25:2-4 ("Folks can come into the office and tell you everything's okay, but then when you get to their house, you know, you're, like, 'Oh, my gosh . . .'").

Upon consideration of the facts and evidence presented, the court finds that Plaintiff has failed to demonstrate a genuine dispute of material fact concerning whether the performance of fieldwork was an essential function of the position of Probation Officer III. The relevant written documents—bolstered by Plaintiff's own understanding of the critical nature of this work—make clear that the position required interaction with clients outside the confines of the probation office, including in the clients' homes and in other locales. This undisputed factual record reveals no reason for the court to second-guess the City's business judgment with regard to the essential functions of employees who hold the position of Probation Officer III. *See Mason*, 357 F.3d at 1119 ("[T]he essential function 'inquiry is not intended to second guess the employer or to require the employer to lower company standards.'") (quoting *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001)).

Further, the facts presented here indisputably demonstrate that the inclusion of the fieldwork requirement in the position is no merely gratuitous reference. An officer's physical presence in the field facilitates their ability to "[d]evelop[] and implement[] a case plan with the offender with the goal of establishing social behavior and repairing harm caused to the community and victim(s) and define goals and objectives to developing pro social behaviors to reduce recidivism." ECF No. 35-1 at 2. To eliminate the fieldwork function would effect a fundamental change in the job of Probation Officer III, thus rendering Plaintiff's requested accommodation facially unreasonable. *See Mason*, 357 F.3d at 1124 ("Mason's request for an at-home accommodation is unreasonable on its face because it seeks to eliminate an essential function of the service coordinator position."); *cf. Hampton*, 87 F.4th at 1195-96 (recognizing that "when an employee's requested accommodation fundamentally changes the job, rather than helps the employee do the job, then that request may be facially unreasonable," and finding that a correctional officer's request for an accommodation to allow him to use a different type of service handgun was "an accommodation *in furtherance* of doing his job" which was "a plausibly reasonable request sufficient to satisfy the third step of his *prima facie* case") (emphasis in original).

Plaintiff has not proffered evidence showing that the fieldwork requirement is nonessential. *See Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1222 (10th Cir. 2016) (if the defendant "[c]ome[s] forward with evidence that a job function or requirement is essential," Plaintiff then "bears the burden to dispute that evidence or otherwise show that the function or requirement is nonessential"); *see also Green v. U.S. Anesthesia Partners of Colo., Inc.*, No. 22-1319, 2023 WL 7015660, at *5 (10th Cir. Oct. 25, 2023) ("If the employer sufficiently

demonstrates a job function is essential, the employee must dispute that evidence or show that the function is nonessential.") (citing *Kilcrease*, 828 F.3d at 1222). Indeed, Plaintiff offers no specific rebuttal evidence. She does not dispute that her medical issues prevented her from performing the various aspects of fieldwork associated with the Probation Officer III position. Neither does she explicitly argue in her papers that these are not essential functions of the position of Probation Officer III.

The court, however, gleans from the record information indicating that one employee had received an exemption from home visits and Defensive Skills Tactics training. City's SOF ¶ 46. The record contains few factual specific regarding this other employee, but it does clearly establish one point: as articulated by Plaintiff's medical provider in the August 2022 RAQ, Plaintiff sought an exemption from *all* fieldwork, not just certain aspects of it. City's SOF ¶¶ 30- 31. Her accommodation request thus was significantly broader on its face than any accommodation purportedly received by the other employee. Therefore, nothing in the undisputed factual record indicates that the City's policy requiring persons in the position of Probation Officer III to conduct significant work in the field is not "job-related, uniformly enforced, [or] consistent with business necessity." *Mason*, 357 F.3d at 1119.

It is for the City, and not this court, to determine that fieldwork is a necessary component of the work of a Probation Officer III. The City was not required to accommodate Plaintiff by modifying or eliminating an essential function of the job, *see id.* at 1124, and Plaintiff's request in the August 2022 RAQ that she be exempt from all fieldwork "was not plausibly reasonable because granting it would require eliminating an essential function of [her] job." *See, e.g.*, *Brown*, 13 F.4th at 1088 (citing *Unrein*, 993 F.3d at 878); *Robert v. Bd. of Cnty. Comm'rs of*

*Brown Cnty., Kansas*, 691 F.3d 1211, 1218-19 (10th Cir. 2012) (finding that an "indefinite reprieve" from "the fieldwork essential to [an employee's] position" as an "offender supervision officer" charged with supervising felony offenders was "an accommodation that is unreasonable as a matter of law" and rendered the employee "not a qualified individual under the ADA"). There is no evidence in the record indicating that, in August 2022, the City had any expectation that Plaintiff would ever be able to resume the fieldwork essential to her position.

Plaintiff therefore has failed to carry her burden of proving the third element of a failure-to-accommodate claim—that she requested a plausibly reasonable accommodation—and the City is entitled to summary judgment.[8]

### B.    No Evidence of Bad Faith in the Interactive Process

Construing Plaintiff's papers liberally, she appears to seek recovery on an alternative failure-to-accommodate theory: alleged defects in the interactive process that followed the August 2022 RAQ that did not reveal a satisfactory reassignment, from Plaintiff's perspective. Response at 8 (asserting that "Plaintiff was not offered an opportunity to discuss accommodations from DCC, OHR. DCC did not offer any potential reasonable accommodations or modifications as requested by Plaintiff[] and physician."); *see also Wilkerson v. Shinseki*, 606 F.3d 1256, 125 (10th Cir. 2010) ("[B]efore an individual can be deemed not 'otherwise qualified' the employer must make an effort to accommodate the employee's disability.") (citing

---

[8] Plaintiff contends that the City "did not provide adequate proof of undue hardship," Response at 8(e), nor was it obliged to do so. *See Brown*, 13 F.4th at 1088 (finding that, because the plaintiff "failed to state a prima facie claim for failure to accommodate," it was "unnecessary to consider the [defendant's] undue-hardship defense"); *see also* ECF No. 39 at 8 ("Plaintiff is not a qualified individual with a disability; thus, she has no cognizable claims under the ADA for which relief may be granted, negating any need for the court to consider affirmative defenses").

*Woodman v. Runyon,* 132 F.3d 1330 (10th Cir. 1997); 42 U.S.C. § 12112(b)(5)(A)). The court finds that Plaintiff has failed to proffer any evidence that would raise a genuine dispute about the City's good-faith participation in the interactive process.

"The interactive process contemplates 'an affirmative obligation to undertake a good faith back-and-forth process between the employer and the employee, with the goal of identifying the employee's precise limitations and attempting to find a reasonable accommodation for those limitations.'" *Norwood v. United Parcel Serv., Inc.*, 57 F.4th 779, 786 (10th Cir. 2023) (quoting *Dansie*, 42 F.4th at 1193); *see also, e.g.*, *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004) (once the interactive process starts, an employer has "a duty to engage in a good faith effort to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations") (cleaned up). The crux of Plaintiff's position here is that the City acted in bad faith by failing to identify alternate positions that would not have been a demotion from the position of Probation Officer III. *See* Response at 8 ("DCC offered positions to Plaintiff during the IAP work reassignment time period that would demote Plaintiff and offer less pay"); ECF No. 6 at 5-6 (stating that most of the "list of internal jobs [Plaintiff] could apply to . . . would be a demotion with a pay cut"). However, Plaintiff has not put forth sufficient evidence for a rational jury to conclude that the City refused to discuss accommodations with her, or that it otherwise failed to proceed in good faith during the interactive process.

To the contrary, the evidence of record shows no genuine dispute that the City explored Plaintiff's possible reassignment to multiple positions within the City and communicated with, and on behalf of, Plaintiff about available positions on numerous occasions. As examples, the

City investigated the possibility of Plaintiff transferring to social case worker positions (of which there were 32 available at one point); positions in the foster care and adult protection units; a position in the "Warrants/Bonding office"; and judicial assistant positions in Denver County Court. ECF No. 36-1 at 24, 27, 34, 56-58, 62-68. Plaintiff rejected a "Legal Administrator" position with the City Attorney's Office because she preferred "a position involving more direct client interaction," *id.* at 39, 41, and she declined a reassignment to a "vital records registrar position" because it did not provide sufficient potential for salary increases. *Id.* at 70. The City also provided Plaintiff with a contact in the District Attorney's Office, even though that Office was not formally a participant in the reassignment process. *Id.* at 26. This record reflects no genuine, triable issue of fact concerning the City's engagement with Plaintiff during the interactive process.

Neither does a triable issue of fact emerge from Plaintiff's argument concerning "demotions" or "less pay" in the positions that were offered during the interactive process. As a baseline matter, the ADA contemplates the possibility of reassignment to a "lower graded position":

> An employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation. An employer, however, is not required to maintain the reassigned individual with a disability at the salary of the higher graded position if it does not so maintain reassigned employees who are not disabled. It should also be noted that an employer is not required to promote an individual with a disability as an accommodation. See Senate Report at 31-32; House Labor Report at 63.

29 C.F.R. § Pt. 1630, App.—Interpretive Guidance on Title I of the Americans With Disabilities

Act (1998). As the Tenth Circuit Court of Appeals has emphasized, the ADA "is not a statute giving rise to a right to advancement. Thus, the only positions that need to be considered for a reassignment are those that are not promotions." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1176 (10th Cir. 1999) (citing *White v. York Internat'l Corp.*, 45 F.3d 357, 362 (10th Cir. 1995) ("[T]he ADA does not require an employer to promote a disabled employee as an accommodation[.]")). To be sure, an "employer should first consider lateral moves to positions that are regarded as equivalent. An employer may only consider lesser jobs that constitute a demotion if there are no such equivalent positions available." *Id.* at 1177 (citations omitted).

Plaintiff, however, has come forward with no evidence pointing to a vacant position at the City for which she was qualified that would not have technically amounted to a demotion from, or at least initially offered less pay than, the position of Probation Officer III—for which she was not qualified at the time because she could not perform all of the essential functions of the job. *See Duvall v. Georgia-Pac. Consumer Products, L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010) ("[A]t the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, reassignment to which would serve as a reasonable accommodation.") (citing *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999)). And had Plaintiff accepted one of the vacant "demotion" positions identified by the City during the reassignment process, she would have "continue[d] to receive the pay rate . . . she earned in [her] former position unless this exceeds the range maximum of the pay range of the new classification, in which case" she would have "receive[d] the range maximum of the pay range of the new classification." Denver Career Service Rule 12-64(D), ECF No. 35-9 at 12.

There is no one-size-fits-all framework into which the interactive process must be

wedged, nor is there a precise dividing line between an interactive process that complies with the ADA and one that does not. But "[w]hile the exact shape of this interactive dialogue will necessarily vary from situation to situation, the interactive process necessarily includes good-faith communications between the employer and employee." *Aubrey*, 975 F.3d at 1007 (quoting *Bartee*, 374 F.3d at 916) (cleaned up). The record here reveals no genuine dispute that the City engaged in good faith in the interactive process. The City has presented an uncontroverted evidentiary record consisting of dozens of pages of communications—with Plaintiff and internally and with multiple City departments—reflecting its efforts to identify a position to which Plaintiff could be reassigned. ECF No. 35-1 at 24-68. And nothing about the City's actions, chronicled in this record, indicates any failure to comply with the reassignment process articulated in Denver's Career Service Rules. *See* ECF No. 35-9 at 9-12.[9]

In sum, based on the record evidence, the court concludes that no reasonable jury could find that the City engaged in the interactive process in bad faith in determining whether a reasonable accommodation existed in the form of a reassignment to a different position. The City accordingly is entitled to summary judgment on this alternative theory of failure to

---

[9] As previously noted, viewing the evidence in the light most favorable to Plaintiff, one employee received an exemption from home visits and Defensive Skills Tactics training. City's SOF ¶ 46. To the extent Plaintiff might suggest that the City acted in bad faith by concealing this information during the interactive process, the court finds "no law supporting the premise of her argument—that an employer may act in bad faith by concealing alternative accommodations it already considered reasonable. This is especially true where, like here, Defendant engaged with the employee, discussed reasonable accommodations, and suggested possible accommodations for Plaintiff." *See Norwood*, 57 F.4th at 788. Such is exactly the case here. Furthermore, Plaintiff's accommodation request—to be granted a reprieve from all fieldwork—is of a different, and more expansive, type than the accommodation ostensibly provided to the other employee.

accommodate.

## II.    Disability Discrimination Claims

According deference to Plaintiff's pleading, the court construes it as attempting to raise three other disability-based claims: (1) a claim for discrimination, separate from a failure-to-accommodate claim; (2) a claim alleging a hostile work environment; and (3) a claim asserting that the City retaliated against her. The court finds that these claims do not survive summary judgment.

### A.    Discrimination Against Plaintiff Because of Her Disability

The City argues that Plaintiff's claim for disability discrimination fails because she could not perform an essential function of her job, rendering her unqualified for the position. ECF No. 35 at 17-18.

"Where, as here, there is no direct evidence of the [City's] discriminatory animus," the court applies the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Aubrey*, 975 F.3d at 1014. At the first step of the analysis, Plaintiff is obliged "to establish a prima facie case of discrimination by showing (1) that [s]he is disabled within the meaning of the ADA; (2) that [s]he is qualified for the job held or desired; and (3) that [s]he was discriminated against because of h[er] disability." *Lincoln*, 900 F.3d at 1192 (internal quotation marks and quotation omitted). The third element is what distinguishes a disability discrimination claim from a failure-to-accommodate claim. While "there is significant overlap between the elements of a failure to accommodate claim and a discrimination claim," *Beard v. Brink's Inc.*, No. 22-cv-1850-WJM-SBP, 2025 WL 274813, at *6 (D. Colo. Jan. 23, 2025), "to recover on her discrimination claim, [Plaintiff] must prove that the [City] acted with a

discriminatory animus against her because she had a disability." *Aubrey*, 975 F.3d at 1014 (citing *Lincoln*, 900 F.3d at 1204). In addition, the Tenth Circuit has made clear that disparate-treatment claims under the ADA require an adverse employment action. *Exby-Stolley*, 979 F.3d at 794.

Here, the only discrete allegedly adverse employment action that can be drawn from the record is that the City failed to accommodate Plaintiff's disability. *See Beard*, 2025 WL 274813, at *6 (recognizing that "the Tenth Circuit has allowed an employee's discrimination claim to proceed where the basis of her claim was the employer's alleged failure to reasonably accommodate her disability") (citing *Aubrey*, 975 F.3d at 1014).[10] But the court has already concluded that there was no failure to accommodate because Plaintiff has failed to produce evidence sufficient to show that she was in fact qualified for the position of Probation Officer III, in light of her physician's statement that she was absolutely restricted from performing fieldwork, an essential element of that position. *See* § I.A., above. Plaintiff's not possessing the

---

[10] In finding that an allegation of failure to accommodate satisfies the adverse employment action requirement for purposes of a discrimination claim, the court also takes into account the Supreme Court's recent holding that an adverse action no longer requires a showing that the harm was "significant . . . [o]r serious, or substantial or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024); *id.* at 354 (holding that an adverse employment action is one that "brought about some 'disadvantageous' change in an employment term or condition") (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)). *Muldrow* abrogated prior case law holding that an employee must establish "significant" or "material" harm as part of the adverse employment action element of a discrimination claim. *See id.* at 353 n.1, 355-56 (abrogating *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998), and *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012)). However, *Muldrow* did not alter the requirement that an adverse action for purposes of a retaliation claim be "'materially adverse,' meaning that it causes 'significant' harm." *See* 601 U.S. at 357 (declining to "import the [material adversity] standard into [Title VII's] anti-discrimination provision") (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

requisite qualifications means that there was no failure to accommodate as a matter of law, and it also means that she cannot satisfy the second element of a prima facie discrimination claim. *See Lincoln*, 900 F.3d at 1192.

Because Plaintiff's disability discrimination claim falls at the prima facie case level, the court need not consider the second and third prongs of the *McDonnell Douglas* analysis: whether the City has articulated a legitimate, nondiscriminatory reason for the employment action at issue and, if so, whether its stated reason was pretextual. *See id.* at 1193. Nevertheless, the evidence in the record reveals no genuine dispute that performing fieldwork was an essential function of the Probation Officer III position—a legitimate, nondiscriminatory reason for the City's decision— or that the City officials involved in assessing Plaintiff's request for accommodation honestly believed that to be the case. On this record, then, Plaintiff has produced no evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1280 (10th Cir. 2010) (discussing what is required for "sufficient evidence of pretext") (internal quotation marks and quotation omitted).

Put simply, any discrimination claim falls along with Plaintiff's failure-to-accommodate claim. The court therefore enters summary judgment in the City's favor on any such claim.

### B.    Hostile Work Environment

Likewise has Plaintiff failed to adduce evidence sufficient to allow a reasonable jury to find that she has satisfied the "high bar" necessary for a hostile-work-environment claim. *Iweha*

*v. State of Kansas*, 121 F.4th 1208, 1224-25 (10th Cir. 2024) (recognizing "the extremely high bar that a plaintiff typically must surpass in order to successfully make a claim that their work environment was not just uncomfortable at times, but overtly hostile in an unlawful way").

To sustain a claim for hostile work environment under the ADA, "the plaintiff must show (1) the employer discriminated against the employee because of her membership in a protected class, and (2) 'the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.'" *Goodson v. DeJoy*, No. 22-1338, 2023 WL 4782947, at *9 (10th Cir. July 27, 2023) (quoting *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1227 (10th Cir. 2022)). To establish a severe or pervasive hostile work environment, "the plaintiff must: (1) subjectively perceive 'the conduct to be severe or pervasive,' and (2) 'show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult.'" *Ford*, 45 F.4th at 1228 (quoting *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021)). "Factors relevant to severity include whether the behavior is 'physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Goodson*, 2023 WL 4782947, at *9 (quoting *Ford*, 45 F.4th at 1228). The Tenth Circuit has "found conduct sufficiently severe to overcome summary judgment in only particularly threatening or humiliating circumstances." *Throupe*, 988 F.3d at 1255 (citing *Morris v. City of Colorado Springs*, 666 F.3d 654, 667 (10th Cir. 2012)). The pervasiveness component of a hostile-work-environment claim "pertains to the frequency of the conduct." *Goodson*, 2023 WL 4782974, at *9 (citing *Ford*, 45 F.4th at 1228).

The potentially problematic comments on which Plaintiff's hostile-work-environment

claim is based are insufficient to raise a triable issue on either the severity or the pervasiveness prongs. Recall that Mr. Hinojosa made a remark about Plaintiff's FMLA status, questioning her ability to train new officers, for which Mr. Hinojosa was counseled. ECF No. 35-5 at 5. Ms. Lucero used the term "burden" in a conversation with Plaintiff, which the HR Investigators determined was a legal term "commonly used . . . when describing provisions of the ADA" and was not intended by Ms. Lucero to disparage Plaintiff. ECF No. 35-11 at 19. And Ms. Maes commented on Plaintiff's shoes being non-compliant with policy and Plaintiff's not using her ergonomic desk, for which Ms. Maes also received counseling. *Id.* at 4, 18, 21.

Nothing about these remarks—all of which were addressed by the HR Investigators and found to have been made with benign, if perhaps misguided, intent—evinces "particularly threatening or humiliating circumstances" that "rise[] to the level of severity required for a hostile work environment claim." *See Throupe*, 988 F.3d at 1255 (citing *Morris*, 666 F.3d at 667). More troubling conduct, of a more degrading nature, has been found not to rise to the level of a hostile work environment. *See, e.g.*, *Iweha*, 121 F.4th at 1223 (comments directed toward a Black woman of Nigerian national origin, including remarks about her hair, that "Nigerian women do not go to school," that Nigerian women who "get educated are bossy," and showing her "slave trade beads," did not "rise to the level of creating a hostile work environment"); *Morris*, 666 F.3d at 666, 668 (comments to a surgical nurse including "get your ass in gear" and "get someone in here who knows what they are doing," along with throwing bloody pericardium tissue at her, did "not make a sufficient showing of a pervasively hostile work environment"; while the conduct "was unquestionably, juvenile, unprofessional, and perhaps independently tortious, viewed in context, we cannot conclude from this record that it objectively altered the

terms and conditions of Ms. Morris's employment").

Plaintiff may have found the remarks made Mr. Hinajosa, Ms. Lucero, and Ms. Maes offensive and sufficient to "give rise to bruised or wounded feelings," but that does not "satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life." *Morris*, 666 F.3d at 664 (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)). As the Tenth Circuit has emphasized, "run-of-the mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces [is] insufficient to support a claim for hostile work environment." *Ford*, 45 F.4th at 1228 (cleaned up) (quotation omitted). At bottom, the comments of which Plaintiff complains are objectively insufficient to support a hostile-work-environment claim. No rational jury could conclude that these comments demonstrate the existence of a work environment so "particularly threatening or humiliating" as to overcome summary judgment. *See Throupe*, 988 F.3d at 1255.

Neither are the comments, made on a handful of occasions, sufficient to raise a triable issue on the pervasiveness prong of the hostile-work-environment test. *See, e.g.*, *Iweha*, 121 F.4th at 1224 (observing that, "a handful of insensitive of insensitive questions" and "two offensive incidents that touched on [an employee's] race and national origin" were "simply not enough" to overcome summary judgment on her hostile-work-environment claim); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (finding that five separate incidents of sexually-oriented, offensive comments over a sixteen month span were not pervasive). Even if the comments directed at Plaintiff could be construed as discriminatory, a hostile-work-environment claim requires "more than a few isolated incidents of prohibited conduct, such as a steady barrage of opprobrious comments based on . . . disability." *Aramburu v. Boeing Co.*, 112

F.3d 1398, 1410 (10th Cir. 1997). Under the facts presented here, these few instances are insufficient.[11]

The court concludes that Plaintiff has not created a genuine dispute of fact that the comments at issue, either individually or in combination, were so severe or pervasive as to alter the terms or conditions of her employment or create an abusive environment. Because Plaintiff has adduced no evidence that would allow a reasonable jury to conclude that she endured a hostile work environment at the City's hands, the City is entitled to summary judgment on her hostile-work-environment claim.

### C.    Retaliation

The ADA prohibits retaliation against individuals who make charges under, or who otherwise exercise rights granted by, the law. *See* 42 U.S.C. § 12203. "To make out a prima facie case, a plaintiff must demonstrate that (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found her employer's subsequent action to be materially adverse; and (3) a causal connection exists between her protected activity and the employer's action." *Lincoln*, 900 F.3d at 1209 (quoting *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009) (cleaned up)). As a preliminary matter, it is unclear from Plaintiff's filings

---

[11] In her response to the Motion for Summary Judgment, Plaintiff refers to Colorado Revised Statute § 24-34-402(1.3), which is a provision of the Colorado Anti-Discrimination Act, or "CADA." *See* ECF No. 38 at 7-8. Plaintiff has not raised a CADA claim in this lawsuit, and in any event, the provision to which she refers was amended in 2023—after the events on which her hostile-work-environment claim is based. *See Peterson v. City of Aurora*, No. 24CA0067, 2025 WL 415486, at *2 (Colo. App. Feb. 6, 2025) (noting that the CADA "amendments were intended to be prospective," and finding that a jury instruction based on CADA's earlier definition of harassment "correctly stated the law in effect at the time of the conduct that [the appellant] alleged"). In short, this provision of CADA has no application here.

whether she intends to raise a retaliation claim based on conduct other than the allegedly hostile work environment. There is no explicit mention of such a claim in her complaint. *See generally* ECF No. 6 at 5 (labeling claims as "failure to accommodate, disability discrimination/harassment, [and] failure to engage in the interactive process in violation of the Americans with Disabilities Act").

However, Plaintiff does assert, in her response to the Motion for Summary Judgment, that she "was retaliated against" when an "accommodation was not approved after filing a complaint with DCC OHR on supervisor, [Francisco Hinojosa]."[12] ECF No. 38 at 7. With this, the court understands that any independent retaliation claim is premised on the allegedly "materially adverse action" of Plaintiff's not receiving an accommodation after she engaged in the protected activity of complaining about Mr. Hinojosa's comment to her in April 2022. Because no other "materially adverse action" is apparent from the record, the court focuses its analysis of the retaliation claim accordingly. *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (an adverse employment action, for purposes of the second element of a prima facie retaliation claim, "is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits") (quotation omitted); *see also Muldrow*, 601 U.S. at 357 (declining to alter the "materially adverse" requirement for retaliation claims).

Assuming, without deciding, that an employer's failure to accommodate can support both a freestanding failure-to-accommodate claim and the materially adverse action element of a

---

[12] As previously noted, there is no dispute on this record that Mr. Hinojosa was not Plaintiff's supervisor. ECF No. 35-20 at 174:18-23.

retaliation claim,[13] the City nevertheless is entitled to summary judgment on any separate retaliation claim Plaintiff may be attempting to raise here.

First, the claim rests on the flawed proposition that there was in fact a failure to accommodate which, as this court has found, Plaintiff has failed to establish with competent evidence. *See Lucas*, 257 F.3d at 1261 (holding that failure to reasonably accommodate plaintiff "merely reclothes [plaintiff's] ADA discrimination claim, which we have already rejected, and it fares no better in this garb").

Second, even if that fundamental defect could be overcome, Plaintiff's retaliation claim cannot survive summary judgment because she did not produce sufficient evidence from which a reasonable jury could infer that the City's accommodation decision in August 2022 was motivated by discriminatory animus causally connected to her complaint about Mr. Hinojosa in April 2022. "To establish a causal connection, [a plaintiff] must present evidence of circumstances that justify an inference of retaliatory motive." *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (internal quotation marks and quotation omitted). "The Supreme Court has likened this burden to a showing of 'but-for causation.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "The evidence of but-for causation 'must be based on

---

[13] United States District Judge Nina Wang has recognized the circular logic underlying this ADA retaliation theory. *Vanech v. Walsh*, No. 21-cv-02804-CMA-NYW, 2022 WL 4010014, at *8 (D. Colo. July 8, 2022), *report and recommendation adopted*, 2022 WL 4010005 (D. Colo. Aug. 5, 2022) (holding that "a failure to accommodate cannot serve as an adverse action for an ADA . . . retaliation claim *because it merely restates an underlying failure to accommodate claim*.") (quoting *Hurley v. Fuchs*, CV 20-850 KG/GBW, 2021 WL 4290134, at *8 (D.N.M. Sept. 21, 2021); citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (emphasis added)).

more than mere speculation, conjecture, or surmise.'" *Id.* (quoting *Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004)).

Here, Plaintiff complained about Mr. Hinojosa's remark in April 2022, prompting an investigation that was completed and closed (without corroborating Plaintiff's allegation) by May 13, 2022. City's SOF ¶¶ 14-15. The City denied Plaintiff's request for an accommodation exempting her from all fieldwork three months later, on August 17, 2022, after it received the August 2022 RAQ. *Id.* ¶ 38. The three-month gap between these events is too long, in and of itself, to establish causation. *See e.g. Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1184 (10th Cir 2002) (holding that a three-month gap between protected activity and adverse action was too long to establish causation by itself); *Hall v. Interstate Brands Corp.*, 395 F. App'x 519, 522 (10th Cir. 2010) (affirming the district court's finding that three months between protected activity and adverse action was too long to establish temporal proximity). "Thus, where a gap of three months or longer has occurred, a plaintiff must present other evidence— more than mere speculation, conjecture, or surmise—to establish that her protected activity was a but-for cause of the adverse employment action." *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) (internal quotation marks and quotation omitted).

Plaintiff has presented no competent evidence otherwise supporting a causal link between her complaint about Mr. Hinojosa's remark and the City's decision that Plaintiff was not able to perform an essential function of the position of Probation Officer III. As already discussed, there is no evidence in the record creating a genuine dispute about the critical nature of fieldwork or the statement from Plaintiff's physician that she was restricting from performing all such work— and that these were the facts that drove the City's decision concerning her request for

accommodation. Moreover, following that decision, the City conducted an investigation and ultimately concluded, on September 30, 2022, that Plaintiff's "allegations of discrimination, harassment and retaliation cannot be substantiated." ECF No. 35-11 at 20. The record thus evinces a clear break in the supposed causal chain between Plaintiff's complaint about Mr. Hinojosa and the alleged failure to accommodate her need for an exemption from an essential function of her job. *See, e.g.*, *Wilson v. Textron Aviation, Inc.*, 820 F. App'x 688, 692-93 (10th Cir. 2020) ("It is well-established in this Circuit that an employer can break the causal chain between the biased subordinate's unlawful actions and the adverse employment action by independently investigating the allegations against the employee.") (quoting *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 516 (10th Cir. 2015); citing *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1294 (10th Cir. 2013) ("[I]f the employer independently verifies the facts and does not rely on the biased source . . . then there is no subordinate bias liability.")).

Because Plaintiff has failed to demonstrate a causal connection between her protected activity and the purported failure to accommodate her disability, the City is entitled to summary judgment on Plaintiff's retaliation claim for this additional reason.

\*    \*    \*

To summarize the foregoing analysis, because there is no genuine dispute as to any material fact concerning any claim Plaintiff attempts to bring, the City is entitled to summary judgment.

## CONCLUSION

For the reasons set forth herein, it is respectfully **ORDERED** as follows:

(1) Defendant's Motion for Summary Judgment (ECF No. 35) is **GRANTED** and final judgment shall enter in favor of Defendant and against Plaintiff on all claims;

(2) Defendant's Motion to Exclude the Testimony of Plaintiff's Non-Retained Experts Pursuant to Fed. R. Civ. P. 26(a)(2) and Fed. R. Evid. 702 (ECF No. 34) is **DENIED as moot**; and

(3) The Clerk of Court is directed to **TERMINATE** this matter accordingly.

DATED: July 3, 2025                     BY THE COURT:


_____
Susan Prose
United States Magistrate Judge